# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 6030 | DATE | 7/19/2004 |
| CASE TITLE | Healy v. City of Chicago, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment (doc. #74), Defendants' Motion to Strike (doc. #86), Healy's Motion to Strike (doc. #90)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] . Defendants' Motion for Summary Judgment is GRANTED as to all counts. Healy's and Defendants' Motions to Strike are DENIED.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | JUL 20 2004 | |
| | Notified counsel by telephone. | | | date docketed | |
| ✓ | Docketing to mail notices. | | | | 92 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| JHC | courtroom deputy's initials | 2004 JUL 19 PM 4:43 FILED-EDI | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DENNIS HEALY,                          )
                                       )
      Plaintiff,                  )
                                       )
                             )      Case No. 00 C 6030
v.                                     )
                                       )      Judge William J. Hibbler
CITY OF CHICAGO, et al.                )
                                       )
      Defendants.                 )

**DOCKETED**

JUL 2 0 2004

## MEMORANDUM OPINION AND ORDER

On October 2, 2000, Plaintiff, Dennis Healy, filed a civil rights action alleging the defendants committed actions in violation of his First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, and in violation of the *Shakman* consent decree. In his Complaint, Healy alleges that the defendants violated his First and Fourteenth Amendment rights by taking adverse employment actions against him: (1) because he reported public employee corruption; (2) because he was not an active supporter of the Democratic Party; and (3) based on impermissible political considerations or affiliations. On May 17, 2001, after briefing by the parties, the Court dismissed all claims of retaliation in Count II, all untimely claims, and all claims for damages against the individual defendants in their official capacity, except for Healy's claims for injunctive relief. The remaining defendants in this case, the City of Chicago ("City"), Richard Rice ("R. Rice"), Francis Blake ("Blake"), and Judith Rice ("J. Rice") (collectively "Defendants") filed the instant summary judgment motion on December 1, 2003. For the following reasons, Defendants' summary judgment motion is granted.

1

## I.    BACKGROUND

Healy is a licensed stationary engineer. He has been employed by the City since 1981, and he is currently assigned to the Mayfair Water Pumping Station ("Mayfair"). Defendant Blake was the Deputy Commissioner of the City's Department of Water ("DOW") from 1996 through September 28, 2001. Blake reported to the Commissioner of the DOW. Defendant R. Rice has been the Commissioner since December 15, 1999, and Defendant J. Rice was the Commissioner from July 16, 1996, through November 30, 1999. John Bolden preceded J. Rice and R. Rice as Commissioner.

From 1992 to as recently as 1999, Healy has periodically reported alleged criminal activity by his co-workers to Defendants, other city officials, and the City Inspector General's Office ("IGO"). The alleged criminal activity, including theft of city property, fraudulent business practices, and drinking on the job, took place predominately in the years 1992 and 1993, but possibly as late as 1995, the date which Healy states the alleged corruption ended. Healy claims that in response to his reports of corruption and because he did not actively support the Democratic Party, he was suspended for five days in August 1993; and from 1993 to the present, he has been reprimanded orally and in writing, denied several promotions, assigned to unfavorable work shifts for an unusually long period of time, transferred to unfavorable assignments, banned from necessary safety meetings, and denied his allotment of vacation days.

After being suspended in August 1993, Healy complained to Bolden. Healy claims that Bolden, and later Blake and J. Rice, promised him that the suspension would be rescinded and the promotion forthcoming. The only evidence of these conversations and promises, however, is Healy's unsubstantiated claims. Defendants deny that they took place. Healy claims that after 1993, he made further complaints of the adverse employment actions against him and of corruption at

2

Mayfair: in 1994 to Mayor Daley, and in 1995 to Michael Daley. In 1999, Healy checked with the IGO on the status of his earlier complaint of corruption. In January 2000, Healy and Blake had a conversation about Healy's lack of promotions.

On May 18, 2001, after briefing by the parties, the Court held that all of Healy's untimely claims were barred. The statute of limitations for 42 U.S.C. § 1983 actions arising in Illinois is two years, *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992), and the statute of limitations for alleged violations of the *Shakman* consent decree is 180 days. *Smith v. City of Chicago*, 769 F.2d 408, 413 (7th Cir. 1985). The Court found that the alleged retaliatory or discriminatory acts Healy complained of that occurred outside the statute of limitations period were not sufficiently linked to the alleged acts that occurred within the statute of limitations period to constitute a continuing violation, and they were thus barred. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 114 (2002) (discrete discriminatory acts, such as failure to promote and denial of transfer, that occurred outside the relevant time period are time-barred); *Selan*, 969 F.2d at 564 (continuing violation doctrine is only justified when it would have been unreasonable to require the plaintiff to sue separately on each alleged discriminatory act). As Healy filed his complaint on October 2, 2000, his § 1983 claims based on acts occurring prior to October 2, 1998, are barred, and his claims for violations of the *Shakman* consent decree that arose prior to April 4, 2000, are barred. The alleged untimely discriminatory acts may only be considered for background purposes in support of Healy's timely claims. *Morgan*, 536 U.S. at 114.

Healy's remaining timely claims are that, as a result of his protected activity, Defendants banned him from safety meetings in October 1998, and denied him promotions to the following positions: (1) Assistant Chief Operating Engineer ("ACOE") on August 26, 1998, of which he was

3

informed on October 2, 1998; (2) ACOE on November 20, 1998; (3) Chief Operating Engineer ("COE") on December 3, 1998; (4) ACOE on June 7, 2000; and (5) ACOE on July 20, 2000.[1] There were various numbers of openings for each position on these dates. Usually four ACOEs are assigned to each steam pumping station such as Mayfair.

As for the safety meetings, Healy claims Fred Hoppe, a former CEO at Mayfair, told him in 1997 or 1998 that he could not go to the safety meetings any longer. (Healy, 389-90).[2] However, Healy admits that he probably went to two safety meetings in 1998 and about one safety meeting per year since 1999. In addition, the evidence does not show how many safety meetings occurred each year, or how many Mayfair employees actually went or were required to go to each safety meeting. In fact, Healy admits that employees do not go to every meeting. (Healy, 387-97).

Mayfair's promotion process occurs as follows. At the beginning of each year, the Deputy Commissioner prepares a hiring plan which lists the position vacancies and the order in which they will be filled. The Department of Personnel ("DOP") for the City determines the number of positions to be filled, and the DOP then sends a list of eligible bidders for the positions to the Commissioner. The Commissioner is advised of the vacancies, and the Deputy Commissioner selects a three-person committee to conduct the interviews of those bidding for a position.

Applicants for positions were interviewed separately with a standard interview form, but there is no ban on the interviewees talking with each other outside of the interview room. After each

---

[1] In Healy's response to Defendants' 56.1 Statement of Facts, he admits that the remaining timely allegations of denial of promotions are from the following selection lists, from which he sought the aforementioned positions: ## 7745000398, 7747000798, 7745000998, 055000030, 055000031, and 055000061.

[2] Citations to depositions filed with the parties' summary judgment motions will be cited as "(Name of Deponent, Deposition Page Number)."

4

interview, the interviewers give the candidate a numerical rating. The interview panel does not know who the candidates are until the day of the interview, unless they gain that knowledge through informal conversations.

Although Healy denies the committee used a standard interview form and interviewed candidates separately, all of the evidence, including the hundreds of pages cited in support of Healy's denials, shows that the interviewers use a rating sheet with pre-set criteria for each interviewee. For example: (1) Thomas Special, a COE at Mayfair, testified in detail as to the specific questions used in interviews, and he affirmed that "we stick to the questions," (Special, 65-77); (2) Robert Cannatello, a COE who served on certain interview panels, stated that "we grade them on their ability of answering questions . . . [t]hen we bring our paper work to the department," (Cannatello, 7); (3) Mary Jo Falcon, the record keeper, submitted an affidavit affirming the use of interview forms, and attaching them to Defendants' motion, Exhibit Q ("Def. Ex. Q"); and (4) Blake testified that "the panel would sum up the results of the bidders" answers to interview questions. (Blake, 12-13). Healy disingenuously includes citations to hundreds of pages of irrelevant citations to the record which do not support his denials. Rather than creating an issue of fact, Healy merely wasted this Court's time.

After the candidates are interviewed and rated, the rating sheets are sent to the Deputy Commissioner's office. The Deputy Commissioner summarizes the interviews and tabulates the scores, without discussing the candidates with the Commissioner or the interview panel. He then compiles a list with the numerical rankings and makes a recommendation based on the scores to the DOP. The DOP then gives the Commissioner a list with the names of those interviewed, their numerical ratings, and the DOP's recommendations for promotion based on the numerical ratings.

5

The Commissioner makes the final promotion decision. Commissioners J. Rice and R. Rice do not recall any time when they did not approve the recommendations of the interview panel for the positions of ACOE and COE.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The opposing party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson*, 477 U.S. at 248. The non-moving party cannot create an issue of fact with speculation or conjecture. *Borcky v. Maytag*, 248 F.3d 691, 695 (7th Cir. 2001). During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560 (7th Cir. 1996).

## III.    ANALYSIS

### A.    Count I – First Amendment Retaliation

A § 1983 claim for retaliation in violation of the First Amendment requires a three-step analysis:

6

> First, the court must determine whether the plaintiff's speech was constitutionally protected. If so, then the plaintiff must prove that the defendant's actions were motivated by the plaintiff's constitutionally protected speech. Finally, if the plaintiff can demonstrate that his constitutionally protected speech was a substantial or motivating factor in the defendant's actions, the defendant is given the opportunity to demonstrate that it would have taken the same action in the absence of the plaintiff's exercise of his rights under the First Amendment.

*Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). Defendants initially claim that they are entitled to qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be immune, Defendants' actions "must not have been in violation of clearly established law of which a reasonable person should have known." *Martinez v. Hooper*, 148 F.3d 856, 858 (7th Cir. 1998) (citing *Harlow*, 457 U.S. 800). Since Healy claims Defendants retaliated against him based on his First Amendment right to speak out on matters of public concern, Defendants must not have known that Healy's speech was constitutionally protected in order to be entitled to qualified immunity. *Martinez*, 148 F.3d at 858. As the Court explains below, Defendants should have known that at least some of Healy's speech touched upon matters of public concern, and Healy's interest as a citizen in speaking out on these matters of public concern outweighed Defendants' interest in promoting efficient public service. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563 (1968).

### 1. Was Healy's Speech Constitutionally Protected?

The first step of this analysis--determining whether the plaintiff's speech was constitutionally protected--is a question of law for the court, which requires application of the two-part *Connick-Pickering* test. *Id.* First, the court must determine whether the plaintiff's speech addressed a matter of public concern. *Connick*, 461 U.S. at 147-48. If so, the court must apply the *Pickering* balancing test to determine whether "the interests of the [plaintiff], as a citizen, in commenting upon

7

matters of public concern" outweigh "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Although Healy's allegations of public corruption and stealing of City property appear to be matters of public importance, "speaking upon a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in *Connick*." *Kokkinis*, 185 F.3d at 844. Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement. *Id.* "It is necessary to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Id.* (internal citations omitted). Conduct that "concerns a subject of public concern but the expression addresses only the effect upon the employee" is not protected by the First Amendment. *Cliff v. Bd. of Sch. Comm'rs*, 42 F.3d 403, 410 (7th Cir. 1994).

Healy alleges that his reports of criminal activity, public corruption, graft and stealing of City property was constitutionally protected speech. Defendants concede that the allegations Healy made to the Inspector General's Office ("IGO") between 1992 and 1993 of public corruption at Mayfair may be a matter of public concern. Defendants deny, however, that Healy's 1999 attempt to determine from the IGO the status of his earlier complaint, or Healy's other complaints between 1993 and 1999, were matters of public concern. Defendants argue that Healy's remaining complaints addressed only the effect of the allegations upon Healy, not the public, and thus were not protected by the First Amendment.

The Court agrees that the allegations Healy made to the IGO and other superiors between

1992 and 1993 are matters of public concern, as they addressed the effect upon the public, not merely upon Healy. After his initial complaints to the IGO and Bolden, Healy's continued complaints over the next several years to Bolden, J. Rice, and Blake focused on the reasons why Healy did not receive certain promotions and why he was assigned to what he considered unfavorable shifts. Although these are obviously of personal interest to Healy, Healy maintained his concern about the alleged corruption at Mayfair and continued to attempt to bring the wrongdoing to light. Therefore, this speech is also protected. Finally, Healy's 1999 communication with the IGO was constitutionally protected, as Healy sought to find out whether the matter of public concern had been addressed.

As the complaints Healy made involved a matter of public concern, the Court must now determine whether these complaints satisfy the second element of constitutionally protected speech, the *Pickering* balancing test. Several factors should be considered when balancing the employee's First Amendment interests against the government's interest in providing services efficiently:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kokkinis*, 185 F.3d at 845 (internal citations omitted). Healy's complaints about his co-workers' misdeeds caused disharmony in the workplace between Healy and his co-workers, specifically, Russ Miller and Ed Laird. However, Defendants do not allege that any of the other *Kokkinis* factors were affected by Healy's protected speech. Applying the *Pickering* balancing test, the Court finds that Healy's interest in commenting upon matters of public concern outweighed the interests of

Defendants, his employer.

### 2. Were Defendants' Actions Motivated By Healy's Constitutionally Protected Speech?

"A plaintiff alleging First Amendment retaliation must prove by a preponderance of the evidence that his or her protected activity was a motivating factor in the defendant's retaliatory action. To clarify, a motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). In order to show the protected activity was a motivating factor, the "plaintiff must demonstrate that the defendant knew of the retaliation *and* knew of the plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999) (emphasis added). Healy cannot sustain his burden on summary judgment with self-serving declarations based on nothing more than his own speculation. *Kelly v. Mun. Ct. of Marion County, Ind.*, 97 F.3d 902, 911 (7th Cir. 1996).

As such, *respondeat superior* is not sufficient to support a finding of individual liability in a § 1983 case. *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984). "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Rasche v. Village of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (citing *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). However, supervisory liability may be established if the plaintiff shows that the supervisor knew of the conduct and facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see. *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1995).

#### a. Defendant Richard Rice

As explained above, the final decisions regarding the promotions in question were made by

10

the Commissioner. In June and July 2000, R. Rice did not select Healy for the position of ACOE. However, Healy does not point to any evidence in the record that R. Rice knew of Healy's protected speech or of the alleged retaliation. In fact, R. Rice asked Blake who Healy was when R. Rice received the instant Complaint. (Blake, 73). Without this knowledge, R. Rice could not have retaliated against Healy. *See Morfin v. City of East Chicago*, 349 F.3d 989, 1005-06 (7th Cir. 2003).

### b. Defendant Judith Rice

J. Rice did not select Healy for the position of ACOE in October 1998 or the position of COE in December 1998. Although J. Rice was aware that Healy had complained of being treated unfairly, there is no record evidence to show that J. Rice was familiar with Healy's corruption claims – the plaintiff's constitutional activities. *Stagman*, 176 F.3d at 999. Healy met with J. Rice in January or February of 1999 (Healy, 310), at which time he complained that he was being denied promotions, people did not like him, and he was being treated unfairly. (J. Rice, 30). Healy does not claim, and J. Rice does not recall, that Healy complained of corruption at Mayfair. (J. Rice, 28-29). Although J. Rice was aware of the possible existence of theft at Mayfair, she did not know who made the allegations of theft or when they were made. (J. Rice, 35).

Even if J. Rice and R. Rice were aware of Healy's complaints of corruption, Healy was not as qualified as the people chosen for the position of ACOE, as he was never ranked as the highest candidate after an interview. (Def. Ex. Q.) Only the applicants who scored the highest on their interviews were hired for each promotion. Healy, however, was ranked: (1) twelfth out of twenty-one applicants in October 1998; (2) fourteenth out of seventeen applicants in December 1998; (3) fourteenth out of thirty-one applicants in November 1998; (4) sixteenth out of twenty-one applicants in June 2000; and (5) eighth out of eleven applicants in June 2000. (Def. Ex. Q.) There is no

evidence to contradict Defendants' claims that they accepted the recommendations of the interviewers as a routine matter. J. Rice and R. Rice, the decision makers, did not deliberately "turn a blind eye" for fear of what they might see. *Gossmeyer*, 128 F.3d at 495. "A supervisor who does not find out what is going on in the workplace should be sacked as incompetent, not lumped with bigots." *Pressley v. Haeger*, 977 F.2d 295, 297 (7th Cir. 1992).

Furthermore, the lengthy delay between the alleged acts of retaliation against Healy and his protected speech undercuts any inference that Healy's corruption complaints were a substantial or motivating factor in the decision not to promote him. *See Kelly*, 97 F.3d at 912 (four-month delay between plaintiff's decision not to work at polls and his termination undercut any inference that plaintiff's withdrawal from politics was motivating factor in decision to fire him); *Benson v. Cady*, 761 F.2d 335, 342 (7th Cir. 1985) (because of five-month delay between prisoner's filing lawsuit and prison authorities' transfer of prisoner, there was insufficient evidence to support an inference that transfer was in retaliation for filing lawsuit). In this case, the delay between Healy's timely claims of retaliation beginning on October 2, 1998, and Healy's reporting of corruption is significant. After 1992 to 1993, Healy complained of corruption in 1994 to Mayor Daley, in 1995 to Michael Daley, in 1999 to the IGO, and in January 2000 to Blake. The only remotely contemporaneous decisions to deny Healy a promotion were on June 7, and July 20, 2000, five to six months after any protected activity. Therefore, Healy's protected speech was not a motivating factor in the Rices' decision not to promote him.

### c.    Defendant Francis Blake

Unlike the Rices, Defendant Blake knew of Healy's complaints of corruption and his complaints of retaliation. However, Blake did not cause or participate in the alleged constitutional

12

deprivation because he was not the decisionmaker in the promotions. *Rasche*, 336 F.3d at 597. The evidence establishes that the DOW Commissioners did not consult with Blake before making their promotion decisions, and they always chose those with the highest interview scores, which was never Healy. *Willliams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003). *See* discussion *supra*. There is also nothing in the record to show that Blake did anything to affect either the decision of the panel or the interview scores.

Moreover, Healy's only evidence that Blake retaliated against him are his claims that during a meeting with Blake in January 2000, Blake told him that promotion decisions "comes from the top down," from the "fifth floor," and "there's a political system, that's the way it works." (Healy, 534). Even assuming Healy accurately quoted Blake, and that these statements are not hearsay,[3] these statements do not show that Healy was not promoted due to his allegations of corruption. First, Blake was explaining the feelings of others, not himself. Second, "isolated and attenuated statements are insufficient to establish discriminatory intent" as to the adverse employment action. *Willliams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process."). Isolated and attenuated statements were all that occurred in the present case, where Blake's statement was not made in connection with a specific promotion decision against Healy. The last time Healy had been passed over for promotion was in December 1998, while Blake's statement occurred over a year later, in

_____

[3]Defendants claim that these statements are hearsay. Blake denies this statement, and Healy has no other evidence to support it. It may be a statement against interest under Federal Rule of Evidence 801 (d)(2)(D), however, if Blake was considered authorized by his employer to speak on promotional matters. *See Williams v. Pharmacia*, 137 F.3d 944, 950-51 (7th Cir. 1998).

January 2000.

In addition, every business has "office politics" or "interpersonal politics" that may affect determinations of promotions. Blake's testimony confirms that this was the politics he was talking about, as Blake claims that he explained to Healy that it is at the "Chief's discretion" whom he chooses to work with, so it was to Healy's benefit to work with his Chief. (Blake, 157-58). Viewing the facts in the light most favorable to Healy, Healy's unsubstantiated claims of Blake's January 2000 statement is not sufficient to show that Healy was passed over for promotion due to his allegations of corruption. *See Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 495 (7th Cir. 2002) (comments such as alderman was "not a big fan" of plaintiff's were not sufficient to show plaintiff was removed from job because of his own aldermanic run). For the above reasons, Blake is not liable for the decision not to promote Healy.

### 3. Would Defendants Have Taken the Same Action in the Absence of Healy's Exercise of His Rights Under the First Amendment?

The evidence shows that even in the absence of Healy's complaints, Defendants would have taken the same actions. According to the only records available, Def. Ex. Q, Healy did not score the highest on any promotion interviews, and the persons who scored highest, not those with the most seniority, were always promoted. *See supra.* Healy does not provide any evidence besides his own inconsistent statements to show that the interview panels were influenced by any other factors.[4] In fact, Healy admits in his deposition that no one was promoted to COE without first being an ACOE, an obvious nondiscriminatory reason why Healy himself was not promoted to COE. (Healy, 340).

---

[4] For example, Healy alleges in his complaint that people were promoted to ACOE without Stationary Engineers Licenses, but in his deposition he admits that no one has been promoted to ACOE without such a license (Healy, 77).

There were also valid, non-discriminatory reasons for Healy's alleged "ban" from safety meetings. Healy admits that there is no expectation, reason, or requirement to attend every meeting, and employees, in fact, did not attend each meeting. In addition, Healy admits that he has attended several meetings in the past three years, and thus he was not "banned" at all. (Healy, 387-97).

### 3.    Municipal Liability

To establish municipal liability under 42 U.S.C. § 1983, Healy must establish that the City of Chicago had unconstitutional policies or customs, as shown by: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Palmer v. Marion County*, 327 F.3d 588, 594-95 (7th Cir. 2003); *Rasche*, 336 F.3d at 597-98. Municipalities may not be held liable for § 1983 claims under a theory of *respondeat superior*. *Palmer*, 327 F.3d at 594.

Healy does not claim that the City had an express policy to retaliate against persons expressing their First Amendment views, and, indeed, there is no evidence of such a policy. In addition, Healy's allegation that the purported constitutional injury against him was caused by a person with final policymaking authority also fails because the Court has already found that J. Rice, R. Rice, and Blake – whom Healy claims are policymakers – did not violate Healy's constitutional rights. Finally, in order to establish a widespread practice, "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer*, 327 F.3d at 595-96 (citing *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995)). Healy only alleges isolated acts of misconduct – that he was retaliated against by being denied

15

promotions and banned for safety meetings – and therefore, the City is not liable for retaliation, and Defendants' motion for summary judgment on Count I is granted.

### B.    Count II – Equal Protection

While the Court previously struck the retaliation claim in Count II, the Court did not strike the equal protection portion of this Count. Healy claims that Defendants violated his Fourteenth Amendment rights by taking adverse employment actions against him based on impermissible political considerations. He claims that Defendants had a custom and policy of coercing employees, including himself, to engage in political partisan activities on behalf of the Mayor of the City of Chicago, the Democratic Party, and its officials or officeholders, in order to receive a promotion. Healy alleges that each person promoted to ACOE and COE in the DOW were substantially less qualified, less experienced, and had less seniority than himself. He alleges that they were hired because of their political activities and affiliations, whereas Healy claims he has not been an active political supporter of any candidate or the Democratic Party since 1991.

In order to establish a violation of equal protection under § 1983, a plaintiff must show the defendants acted with a nefarious discriminatory purpose – either intentionally or with deliberate indifference – and discriminated against him based on his membership in a definable class. *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 752-53 (7th Cir. 1999). "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Id.*

### 1.    Class Membership

16

The first issue is whether Healy is a member of a definable class. In *Gray v. Lacke*, the Seventh Circuit held that a group "of employees who stand up for their constitutional rights" is not a recognizable class. 885 F.2d 399, 414 (7th Cir. 1989) (holding that plaintiff was retaliated against because of her conduct of complaining about and filing grievances, not because she is a woman). As in *Gray*, the only conceivable class Healy could be in is one whose members stand up for their constitutional rights or whose members do not support the Democratic Party, neither of which are a recognized class that can form the basis of an equal protection claim.

Although the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," Healy cannot support the claim that he is a "class of one." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To prevail on this claim, Healy must demonstrate that Defendants treated him differently from individuals who are *prima facie* identical to him in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward him by Defendants. *Albiero*, 246 F.3d at 932 (internal citations omitted). "If the defendant would have taken the complained-of action anyway, even if it didn't have the animus, the animus would not condemn the action. Ill will must be the sole cause of the complained-of action." *Id.* As explained above, Defendants would have denied Healy the promotions and kept him out of certain safety meetings even without any animus toward Healy. Healy never received one of the highest interview scores, and employees were not expected to attend every safety meeting. Therefore, Healy is not a member of a recognizable class.

## 2. Similarly Situated Individuals

Furthermore, Healy does not show that similarly situated individuals were treated differently than himself. Healy does not present any evidence of when or if Defendants became aware of Healy's political activities, or lack thereof, or if Defendants knew of the political activities of other applicants for promotion to ACOE and COE. Without knowledge of whether Healy or other employees possessed the characteristic – political activism – which Healy claims caused him to be treated differently, Defendants could not have treated Healy differently based on this characteristic. *Spiegla*, 371 F.3d at 942.

Healy's claim consists of uncertain speculation, unsupported by evidence, and is not sufficient to state an equal protection claim based on his lack of political activism. When asked if one candidate was promoted because he was from the 11th Ward, Healy admitted that "There's definitely a possibility there. But, like I say, we don't know that." (Healy, 345). In addition, while Blake may have solicited employees to work at a phone bank, there is no evidence that he knew the political affiliations of those he asked to work at the phones or that he treated those that worked the phones differently. In fact, Healy does not claim that Blake ever approached him to work at a phone bank, or that Healy ever refused to do so. Moreover, there is no evidence, other than Healy's unsubstantiated claims, that either J. Rice or R. Rice was aware of any of the political affiliations or activities of any of the candidates for promotion, let alone Healy.

Furthermore, many of the successful applicants for promotion shared Healy's alleged protected characteristic of not being an active supporter of the Democratic Party. Russell C. Miller, who was a COE in 1993, was politically active in the Republican Party. (Miller, 65). In addition, at least two of the individuals promoted to ACOE instead of Healy, Thomas Chmura and Mark Henmueller, never worked or were asked to work at a phone bank, did not know who their

18

committeemen were, and were not active in politics. (Chmura, 11; Henmueller, 13-14). Similarly, Ed Laird, the Former Chief Engineer of Pumpage at Mayfair had never worked for a candidate and was not politically active. (Laird, 33). Although Clint Towers, another individual promoted to ACOE, was politically active, he had to work eight years before being promoted. (Tower, 4). Healy has no evidence of the political affiliation or activity of the other individuals who were promoted to the positions of ACOE and COE during the period of which he complains.

### 3. Nondiscriminatory Reasons for Promotions

Each time Healy applied for an ACOE or COE position, he was interviewed and then denied the promotion. Healy claims that the persons selected for the promotions were substantially less qualified, less experienced, and had less seniority than Healy. In addition, Healy claims that J. Rice told him in January 1999 that there was no reason why Healy was not promoted or should not be promoted to the positions. Healy, however, was only in the top quarter of seniority of A Engineers. (Blake, 112). As many as eight or nine A Engineers with more seniority than Healy also did not receive promotions. Furthermore, as explained above, Healy did not perform well in the interviews. Thomas J. Special, COE at Mayfair since 1998, testified that during the interview, Healy was unresponsive and off-subject and gave incorrect responses to questions. (Special, 60-62).

Although Healy claims the interview process was irrelevant and promotions were predetermined, the only evidence regarding the content of the questions are Healy's own claims. As explained above, Defendants testified that they used the same questions for each interviewee, and they provided records of the questions commonly asked and the scores for which their responses were rated. *See* Def. Ex. Q. Special also testified that the interviewers "stick to the questions." (Special, 65). Although Healy claims that convicted felons and individuals without high school

19

diplomas were promoted ahead of him, he admits that the DOW has no educational requirements for the positions of ACOE and COE, and has no bar to hiring convicted felons. (Blake, 85-87). The relevant point is that Defendants' legitimate nondiscriminatory reason for not promoting Healy was his poor interview scores.

### 4. Timing

Furthermore, a significant amount of time elapsed between Healy's timely claims after October 2, 1998, and when he claims to have stopped actively supporting the Democratic Party. Healy claims that he stopped supporting the Democratic Party in 1991 (although he attempted to run for alderman in the election prior to his deposition), and he alleges – without evidence – that Defendants knew he stopped being an active supporter. (Healy, 411-12). This time gap further shows that Defendants did not make the decision not to promote Healy or allow him in safety meetings because he was not an active Democratic supporter. *See Kelly*, 97 F.3d at 912; *Benson*, 761 F.2d at 342. Therefore, Healy's equal protection claim fails, and Defendants' motion for summary judgment on Count II is granted.

### C. Count III – The *Shakman* Decree

In the third count of his complaint, Healy alleges that Defendants violated the consent decree entered in *Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315, 1358 (N.D. Ill. 1979), *vacated sub nom. Shakman v. Dunne*, 829 F.2d 1387, 1389 (7th Cir. 1987) (the "*Shakman* decree"). The *Shakman* decree enjoined the City from "conditioning, basing, or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time a governmental employee, upon or because of any political reason or factor." Once a plaintiff shows this, the burden shifts to the defendant to show it would have made the same decision

20

notwithstanding the political reason. *Shanahan v. City of Chicago*, 82 F.3d 776, 780 (7th Cir. 1996). The consent decree binds the City to liability under a *respondeat superior* analysis. *Wzorek v. City of Chicago*, 906 F.2d 1180, 1184 (7th Cir. 1990).

Healy claims that Defendants violated the *Shakman* decree because they took adverse employment actions against him for not being an active political supporter of any candidate, the Mayor of Chicago, Democratic officials and officeholders, or the Democratic Party since 1991. In this Count, Healy again alleges that the persons selected for promotions to the positions of ACOE and COE in the DOW were less qualified, less experienced and had less seniority than himself, but were selected because they were political partisan supporters of the Democratic Party or its officials.

Healy has standing to bring this claim, as he is alleging that he, personally, was denied promotions because of his lack of political activism. "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Plotkin v. Ryan*, 239 F.3d 882 (7th Cir. 2001) (citing *Shakman v. Dunne*, 829 F.2d at 1399). Healy was injured by being denied promotions by Defendants. Even though Healy has no legal entitlement to a promotion, the government may not deny him a promotion because of his constitutionally protected conduct. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 72 (1990). Thus, if Defendants acted unlawfully under the *Shakman* decree by refusing to promote him based on a political reason, Healy's injury is traceable to Defendants.[5] In addition, Healy's personal injury would be redressed by his requested injunctive relief, which includes granting him the promotion he claims he was denied for unlawful reasons.

_____

[5] Defendants claim, without legal support, that Healy was an active supporter of the Democratic Party because he voted Democratic. This is a far-fetched claim as voting records are private, while Healy's claim needs Defendants to have visibly seen Healy's support.

Although Healy has standing to bring a *Shakman* claim, his claim fails. In order to show Defendants failed to promote him because he was not active in the Democratic Party, Healy must show Defendants knew the political affiliations of: (1) Healy; (2) the other unsuccessful applicants; and (3) those successfully promoted to the job of ACOE or COE. *Shanahan*, 82 F.3d at 781 (citing *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992); *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996). As explained above, Healy has not shown that Blake, J. Rice or R. Rice knew of his or other applicants' political affiliations. In addition, in his deposition, Blake unequivocally denied knowledge of the political affiliations of Healy, other than what he read in Healy's Complaint. (Blake, 166, 247-48). Healy did not produce any evidence to rebut this, and therefore, Healy cannot survive summary judgment on this count. *See Shanahan*, 82 F.3d at 781. *See also Tarply v. Keistler*, 188 F.3d 788, 791 (7th Cir. 1999) (even proof that defendants advocated employment decisions does not show that defendants took an active role in influencing the decision according to political affiliations).

Healy's claim that Blake may have asked his co-workers to work phone banks on occasion does not show Blake recommended these employees for promotions based on their political affiliations. In addition, Blake was not the final decisionmaker in promotions, and the Commissioners did not discuss with him their choice of candidates. (Blake, 155). Healy is unable to offer anything beyond his own unsubstantiated and self-serving assertions that Blake or the DOW Commissioners knew of his or any other promotion applicants' political activities.

Moreover, the only substantiated evidence, the interview scoring forms, shows that political recommendations were not a factor in promotion decisions. Only those with the highest scores were promoted, some politically active people were not promoted, and many non-politically active people

were promoted. Chmura, promoted to ACOE in November 1998, claimed that not only has he never worked or was asked to work a phone bank, he does not know who his committeeman is and is not active in politics. (Chmura, 11). Tower, promoted to ACOE in November 1998, worked eight years before being promoted even though he was a precinct captain and was politically active. (Tower, 4-10). Henmueller, promoted to ACOE in November 1998, has never performed any volunteer political work, never supported a candidate, and was never asked to work a phone bank. (Henmueller, 13-14). Paul Havey, also promoted to ACOE in November 1998, has never performed any volunteer political work. (Havey, 5). There is no evidence beyond Healy's accusations that the other individuals promoted between 1998 and 2000, including Nick Dever, William Kucera, James Gerzon, Albert Garcia, Lemmie Carr, Roy Phillips, Harvey Hunker, Craig Beberdick, Michael Outley, and Peter Brejnak, were involved in volunteer political work or had any political affiliations. In fact, Healy does not even allege the political affiliations of a number of individuals promoted to the positions of ACOE during the period of which Healy complains. As there are no issues of material fact to support Healy's claim that the adverse employment actions were taken for political reasons, Defendants' motion for summary judgment on Count III is also granted.

## IV.    Motions to Strike

Defendants have filed a motion to strike portions of Healy's affidavit and certain paragraphs of Healy's 56.1 (b)(3)(A) Statement of Additional Facts. These motions are moot as the Court has granted summary judgment on all counts for Defendants.

Healy has filed two motions to strike: (1) a motion to strike portions of Defendants' Local Rule 56.1 (a)(3)(A) Statement and Defendants' Memorandum; and (2) a motion to strike portions of Defendants' Response to Plaintiff's Local Rule 56.1 (b)(3)(B) Statement. District courts have

discretion to interpret and apply the local rules. *Tenner v. Zurek*, 168 F.3d 328, 331 (7th Cir. 1999). As demonstrated by this opinion, the Court is capable of determining which statements go towards establishing a material issue of fact. Thus, Healy's motion to strike statements on the existence and level of corruption at Mayfair and matters relating to job performance is denied.[6] Healy next seeks to strike several other statements on the grounds that they are "nonsense" or irrelevant. The Court similarly denies this request because the Court has appropriately considered the relevant material and disregarded the irrelevant material.

Healy also seeks to strike Defendants' Exhibit Q, the deposition and records of Mary Jo Falcon, Mayfair's record keeper. Healy argues that Falcon's deposition and records are biased and therefore unreliable, irrelevant, and hearsay. However, Healy offers nothing other than conjecture and speculation to support this claim of bias. In addition, the written records regarding the interview process are clearly relevant as they show that Healy was denied promotions based on permissible factors. Finally, as Falcon has established that she is the keeper of records and has knowledge of the department's promotion procedures, the documents supporting her affidavit are business records under Federal Rule of Evidence 803 (6) and therefore admissible as such.

---

[6]Ironically, Healy includes much more argument about the level and existence of corruption at Mayfair than Defendants.

## V. CONCLUSION

For the forgoing reasons, the Court finds no genuine issues of material fact have been raised, and the Court grants summary judgment in favor of Defendants on all Counts.

IT IS SO ORDERED.

_7/19/04_
Dated

The Honorable William J. Hibbler
United States District Court